KOYO SEIKO CO., LTD. and
Koyo Corporation of
U.S.A., Plaintiffs,

v.

The UNITED STATES; the United
States Department of Commerce,
Defendants,

The Timken Company, Defendant–
Intervenor.

No. 90–06–00300.

United States Court of
International Trade.

May 15, 1992.

Opinion and Order on Denial of
Rehearing, Aug. 21, 1992.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Susan P. Strommer, Jonathan A. Knee, Susan E. Silver, Neil R. Ellis, T. George Davis and Niall Meagher, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel: Joan L. MacKenzie, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., John M. Breen and Margaret E.O. Edozien, Washington, D.C., for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

This action, brought by Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"), challenges the Department of Commerce's final results in an administrative review of antidumping findings for *Tapered Roller Bearings Four Inches or Less in Outside Diameter From Japan; Final Results of Antidumping Duty Administrative Review* ("Final Results"), 55 Fed.Reg. 22,369 (1990), for the period of April 1, 1974 through March 31, 1979 for Koyo.

On October 31, 1973, Timken filed a petition requesting the imposition of antidumping duties on tapered roller bearings ("TRBs") from Japan. *Tapered Roller Bearings From Japan; Antidumping Proceeding Notice*, 38 Fed.Reg. 33,408 (1973). On December 4, 1973, the United States Department of the Treasury ("Treasury") published an "Antidumping Proceeding Notice" advising that it was instituting an inquiry to determine the existence of sales at less than fair value. *Id.* Treasury then directed Customs officers to withhold appraisement of TRBs effective June 5, 1974. *Tapered Roller Bearings From Japan—Antidumping; Withholding of Appraisement Notice*, 39 Fed.Reg. 19,969 (1974). On September 3, 1974, Treasury published its determination that TRBs were being, or were likely to be sold at less than fair value. *Tapered Roller Bearings From Japan—Antidumping; Determination of Sales at Less Than Fair Value*, 39 Fed.Reg. 32,337 (1974). The International Trade Commission determined on January 23, 1975, that the United States industry would likely be injured by the TRB imports in question. *Tapered Roller Bearings and Certain Components Thereof From Japan; Determination of Likelihood of Injury*, 40 Fed.Reg. 4,366 (1975). Treasury published a dumping finding on August 18, 1976. *Tapered Roller Bearings and Certain Components From Japan*, 41 Fed. Reg. 34,974 (1976). Although the United States Customs Service ("Customs") prepared liquidation instructions after the dumping finding, it appears that no Koyo entries subject to this finding were liquidated.

After the dumping finding, Treasury began to periodically send Koyo and its American subsidiary, American Koyo Corporation, assessment questionnaires and requests for updated information, covering the entire period at issue here. Subsequent Treasury verifications took place and, in July 1979, Koyo received two master lists covering Koyo's entries from April 1, 1974 through September 30, 1977. According to Koyo, these results were flawed.

*See Plaintiffs' Motion for Judgment on the Agency Record* ("Plaintiffs' Motion") at 7. The master lists appeared to be suspended in 1979 due to these flaws. Administrative Record ("AR") (Pub.) Doc. 93.

Effective January 2, 1980, the authority for administering the antidumping law was transferred from Treasury to the United States Department of Commerce ("Commerce"), by Exec.Order No. 12,188, 3 C.F.R. 131 (1980). Subsequently, Commerce began to conduct administrative reviews of unliquidated entries pursuant to 19 U.S.C. § 1675 (1980). By March 17, 1980, Commerce had corrected a master list for Koyo covering the period January 1, 1977 through September 1, 1977. AR (Conf.) Doc. 58. This master list revealed zero percent margins for Koyo; however, these entries were not liquidated. AR (Pub.) Doc. 169. In August 1981, Koyo received a handwritten list of less than fair value calculations from Commerce covering the entire review period, with a cover memorandum requesting quantities corresponding to each bearing. AR (Conf.) Doc. 100; *Plaintiffs' Motion* at 10. On September 1, 1981, Commerce published preliminary results for forty known firms covered by the 1976 dumping finding; however, Koyo was not included. *Tapered Roller Bearings and Certain Components Thereof From Japan: Preliminary Results of Administrative Review and Tentative Revocation in Part of Antidumping Finding* ("TRBs From Japan I"), 46 Fed.Reg. 43,864 (1981). In addition, preliminary results for NTN (another large Japanese manufacturer) were published on February 27, 1981. *Tapered Roller Bearings and Certain Components Thereof From Japan; Preliminary Results of Administrative Review of Antidumping Finding; NTN Toyo Bearing Co., Ltd. and NTN Bearing Corporation of America; and Tentative Determination to Revoke in Part* ("TRBs From Japan II"), 46 Fed.Reg. 14,371 (1981).

Subsequently, Commerce continued to conduct annual reviews for periods after those under this review, and to verify Koyo's submissions. In February 1982, Commerce informed Koyo that margins set at close to zero percent would appear short-ly in a preliminary determination. AR (Conf.) Doc. 320; *Plaintiffs' Motion* at 12. These preliminary results were never issued. AR (Pub.) Doc. 151.

On September 19, 1983, Timken alleged to Commerce that Koyo's home market sales were below the cost of production. AR (Pub.) Doc. 194. As a result, on September 29, 1983, Commerce issued questionnaires on cost of production covering entries made as early as April 1, 1978, AR (Pub.) Doc. 198, to which Koyo responded on January 11, 1984, AR (Conf.) Doc. 144. These responses were verified in April 1984. AR (Conf.) Doc. 153.

On March 9, 1984, Commerce issued final results for forty Japanese exporters subject to the September 1, 1981 preliminary results, relying on Treasury master lists as "best information available." *Tapered Roller Bearings and Certain Components Thereof From Japan; Final Results of Administrative Review of Antidumping Finding* ("TRBs From Japan III"), 49 Fed. Reg. 8,976 (1984). Koyo was not included in these results.

Effective October 30, 1984, § 751 of the Tariff Act of 1930 was amended to require annual reviews only when interested parties request reviews within forty-five days. On October 8, 1985, The Timken Company requested reviews of Koyo and NSK, which were performed by Commerce of Koyo and NSK TRBs for the period April 1, 1974 to July 31, 1984. *International Trade Administration; Initiation of Antidumping Duty Administrative Review*, 51 Fed.Reg. 24,883 (1986). The Federal Register notice informed that final results for these reviews would be issued by July 31, 1987.

On August 4, 1986, Koyo was asked to supplement data to the questionnaire responses previously submitted. AR (Conf.) Doc. 170. Koyo submitted this information in September 1986. AR (Conf.) Doc. 182. In late 1986 and early to mid-1987, Commerce conducted verifications of this new information which pertained to entries made between April 1, 1974 through July 31, 1986. AR (Conf.) Doc. 264. On December 28, 1987, Koyo received another ques-

tionnaire for entries dating back to April 1974. AR (Pub.) Doc. 332. Koyo objected to this questionnaire, but responded to the request. AR (Pub.) Doc. 326.

On March 29, 1989, the International Trade Administration ("ITA" or "Commerce") published section 751(a) preliminary results on Koyo's entries covering the period from April 1, 1974 through March 31, 1979, which stated that based on best information available, the weighted average dumping margins for Koyo ranged from 16.44% to 22.86%. *Tapered Roller Bearings Four Inches or Less in Outside Diameter and Certain Components Thereof From Japan, Preliminary Results of Antidumping Duty; Administrative Review.* 54 Fed.Reg. 12,938 (1989). On June 1, 1990, Commerce issued the final results for Koyo and NSK TRBs, finding that the dumping margins for Koyo ranged between 18.81% to 35.89%. *Tapered Roller Bearings Four Inches or Less in Outside Diameter From Japan; Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 22,369 (1990).

Koyo seeks judgment on the agency record as to all five counts in its complaint, claiming that Commerce's final results are unsupported by substantial evidence and are not in accordance with law. While acknowledging that the case should be remanded for recalculation of Koyo's dumping margins for the period April 1978 to March 1979, and for application of the twenty percent cap at the end rather than the beginning of the model selection process, Commerce opposes this motion, claiming that its methodology was reasonable, in accordance with law, and that best information available was properly used in calculating the dumping margins.

## DISCUSSION

Pursuant to the Tariff Act of 1930, in reviewing a final determination of Commerce, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *The Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. Use of Master Lists

█ In this action, plaintiffs request this Court to order the immediate liquidation of Koyo's entries at the "as entered" zero assessment rate. Alternatively, they urge this Court to liquidate the entries at issue pursuant to master lists. *Plaintiffs' Motion* at 20–21.

Commerce claims that the statutory scheme requires them, as the administering body, to conduct administrative reviews of dumping findings issued pursuant to the 1921 Act and the results of these reviews are to serve as the basis for the assessment of antidumping duties upon entries covered by the final results of the review and for deposits of estimated duties.

A § 751(a) review, however, "does not apply to entries which were on master lists issued before the effective date of the Act." *The Timken Co. v. Regan,* 4 CIT 174, 178, 552 F.Supp. 47, 51 (1982). Section 1002(b)(3) of the 1979 Act provides as follows:

(b) TRANSITIONAL RULES.—

. . . .

(3) CERTAIN COUNTERVAILING AND ANTIDUMPING DUTY ASSESSMENTS.—The amendments made by this title … shall apply with respect to the review of the assessment of, or failure to assess, any countervailing duty or antidumping duty on entries subject to a countervailing duty order or antidumping finding if the assessment is made after

the effective date. If no assessment of such duty had been made before the effective date that could serve the party seeking review as the basis of a review of the underlying determination, made by the Secretary of the Treasury or the International Trade Commission before the effective date, on which such order, finding, or lack thereof is based, then the underlying determination shall be subject to review in accordance with the law in effect on the day before the effective date.

Trade Agreements Act of 1979, 19 U.S.C. § 1516a note (1980) (Effective Date; Transitional Rules).

The legislative history of § 1002(b)(3) reflects Congress' intent that any cases pending before the effective date of the bill "and cases which were far advanced in the administrative process before the effective date, are to proceed as if the bill had not been enacted into law." S.Rep. No. 249, 96th Cong., 1st Sess. 1 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 641.

The facts in the case at hand are similar to *Timken v. Regan,* 4 CIT 174, 552 F.Supp. 47. In *Timken,* the entries in question were liquidated subject to the master list predating the Act. The court further held that a § 751(a) review did not apply since the master lists "were issued before the effective date of the Act." *Id.* at 178, 552 F.Supp. at 51. In reaching its conclusion, the court also considered the fact that "the proceedings were far advanced in the administrative process before the Trade Agreements Act of 1979 went into effect." *Id.*

In the case at bar, master lists existed for entries entered between April 1, 1974 to September 30, 1977. Therefore, all entries subject to master lists existing prior to the date of transfer of jurisdiction must be liquidated accordingly.

2. Entries not covered by Master Lists

■ Several of the latter entries, specifically those entered between October 1, 1977, and March 31, 1979, were not covered by master lists. Information submitted by Koyo for these entries was verified by Treasury in September 1979. AR (Conf.) Doc. 44. Although no deficiencies were reported at that time, contrary to plaintiffs' contentions, the investigation was not "far advanced" enough to warrant application of the old law. *See Timken,* 4 CIT at 178, 552 F.Supp. at 51. The bulk of the investigation occurred after January 1, 1980. Thus, in accordance with the transitional rules, a § 751 review was in order.

On September 1, 1981, Commerce published preliminary results for forty known firms covered by the 1976 dumping finding; however, Koyo was not included. *TRBs From Japan II,* 46 Fed.Reg. 43,864 (1981). In addition, preliminary results for NTN were published in February 1981. *TRBs From Japan II,* 46 Fed.Reg. 14,371.

In February 1982, Commerce informed Koyo that margins set at close to zero percent would appear shortly in a preliminary determination. AR (Conf.) Doc. 320; *Plaintiffs' Motion* at 12. These preliminary results were never issued. AR (Pub.) Doc. 151. Nevertheless, having not issued preliminary results for Koyo's administrative review covering the same period, Commerce instead decided to commence a *de novo* review in July 1986 using a three factor methodology to determine "such or similar" merchandise. In 1987, Commerce subsequently changed its methodology again utilizing five factors to determine "such or similar" merchandise. AR (Pub.) Doc. 322.

■ Plaintiffs claim that the retroactive application of successive new methodologies for calculating dumping margins in this case, many years after the entries at issue had been entered, is not supported by the express terms of the antidumping law and, in fact, is directly contrary to the fundamental principle that this law is remedial rather than punitive in nature.

Commerce in turn claims that its changes in methodology were reasonable and necessary because Koyo had been permitted to select what it considered to be similar home model TRBs and that Commerce's 1984 verification disclosed that Koyo had seriously under-reported its home market sales and

had not made proper model comparisons. *Defendants' Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record* at 34.

It is well-established that Commerce is granted tremendous deference in selecting the appropriate methodology. *ICC Indus., Inc. v. United States*, 812 F.2d 694, 699 (Fed.Cir.1987); · *Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.*, 753 F.2d 1033, 1039 (Fed.Cir.1985). As long as its decision is reasonable, then Commerce has acted within its authority even if another alternative is more reasonable.

In the case at hand, the methodology employed by Commerce was reasonable, but the delay and changes in methodology were unreasonable. This final determination should have been completed years ago. To allow Commerce to prolong the determination would be to reward it for its delay. Commerce cannot suspend the administrative process indefinitely until "better" methodologies are discovered or "better" data is available.

■ While Commerce does have the latitude to act within its own discretion and in a reasonable fashion, there are boundaries to the scope of reasonableness. Commerce has certain obligations and one such obligation is to proceed with investigations in a timely manner within reasonable limits. Issuing a final determination sixteen years after the initial entries were entered greatly exceeds even the broadest definition of reasonable.

Section 1675(a)(1) states that:

At least once during each 12–month period ... the administering authority ... shall—

(A) review and determine the amount of any net subsidy,

(B) review, and determine ... the amount of any antidumping duty, and

(C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of

any net subsidy or margin of sales at less than fair value....

19 U.S.C. § 1675(a)(1) (1988).

It has been determined, however, that the timetable for completion of a § 751(a) review is directory and not mandatory "because Congress did not provide for a prohibition or adverse consequence to be imposed for failing to meet the statutory deadline." *Nakajima All Co. v. United States*, 12 CIT 585, 589, 691 F.Supp. 358, 362 (1988); *see also American Permac, Inc. v. United States*, 10 CIT 535, 539–40, 642 F.Supp. 1187, 1191–92 (1986); *Nissan Motor Corp. In U.S.A. v. United States*, 10 CIT 820, 825, 651 F.Supp. 1450, 1455 (1986).

Nevertheless, the Court of Appeals has recognized that the court has the authority to exercise its sound discretion to fashion an appropriate remedy in compelling Commerce to complete the processing of "ongoing" administrative reviews in appropriate circumstances. *Sharp Corp. v. United States*, 837 F.2d 1058 (Fed.Cir.1988). Furthermore, this Court has issued writs of mandamus compelling Commerce to complete administrative reviews within a certain period of time. *Nakajima*, 12 CIT 585, 691 F.Supp. 358.

■ Thus, while the statutory framework does not provide a restraint on Commerce for failing to complete an administrative review within a reasonable time, equity dictates that the issuance of a final determination eleven years after the last entry in question is an abuse of Commerce's discretion and prejudicial to Koyo. In light of the circumstances in this case, Commerce's second change in methodology, from three factors to five factors was simply another delay in the investigation and was thereby unreasonable and not supported by substantial evidence.

*Violation of Koyo's Due Process Rights*

■ Plaintiffs additionally claim that the excessive delay violates their constitutional rights of due process under the law. The Supreme Court has set forth a four part test to determine whether an administrative delay is so excessive as to violate due process. *United States v. Eight Thou-*

*sand Eight Hundred and Fifty Dollars,* 461 U.S. 555, 564, 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143 (1983). The Court must weigh four factors: the length of the delay, the reason for the delay, the party's assertion of his right, and the prejudice to the party. *Id.*

In *$8,850,* the Supreme Court noted that the first element, length of the delay, "is to some extent a triggering mechanism." *Id.* at 565, 103 S.Ct. at 2012. The Supreme Court deemed eighteen months as a substantial delay of time, but they balanced the delay with the Government's diligent efforts in processing the petition and ruled that there was no prejudice. *Id.* at 569–70, 103 S.Ct. at 2015. In this case, the unreasonably long delay is corroborated by the Government's lack of an excuse. The Government did not pursue any diligent efforts. The only explanation for the delay offered by Commerce is that this type of investigation is "the most difficult and time consuming to do." AR (Conf.) Doc. 320, Exhibit 2. Furthermore, Koyo was prejudiced by the fact that their determination was delayed while Commerce issued final results for all forty of the Japanese manufacturers/exporters of TRBs subject to Treasury's 1976 dumping finding that had been included in Commerce's preliminary results of September 1, 1981. *See TRBs From Japan III,* 49 Fed.Reg. 8,976.

Thus, for the foregoing reasons, this case is remanded and all entries made between October 1, 1977 and March 31, 1979 are to be recalculated in accordance with the three factor model-match methodology.

3. Commerce's Requests for Remand Regarding Improper Calculations in Dumping Margins

A. *Below-Cost-of-Production Sales*

Commerce claims and Koyo agrees that the case should be remanded to Commerce for recalculation of dumping margins for the April 1, 1978 to March 31, 1979 period without reference to the investigation of below-cost-of-production sales.

Commerce commenced a cost of production investigation pursuant to 19 U.S.C. § 1677b(b) to determine whether Koyo's

TRBs during the period April 1, 1978 to March 31, 1979 were sold in the United States at prices which were below the cost of production. The use of best information available in the investigation resulted in the exclusion of most of the home market sales.

Koyo claims that in 1983 Commerce did not have "reasonable grounds" to institute an investigation of sales at less than the cost of production. Now, after reviewing the administrative record, Commerce concedes that its investigation of the cost of production is contrary to its current practice.

In *Al Tech Specialty Steel Corp. v. United States,* 6 CIT 245, 575 F.Supp. 1277 (1983), *aff'd on other grounds,* 745 F.2d 632 (Fed.Cir.1984), the court stated that "absent a *specific* and *objective* basis for suspecting that a *particular* foreign firm is engaged in home market sales at prices below its cost of production, section 773(b)'s threshold requirement of 'reasonable grounds to believe or suspect' has not been satisfied." *Id.* at 250, 575 F.Supp. at 1282 (emphasis in original).

The court further explained that:

> [T]he mere use of the adjective "loss-making" fails to show less-than-cost-of-production sales of a *single product* sold in a discrete market where the company ... sold a vast range of products in markets around the world.... [Furthermore,] evidence of a company-wide loss fails to adequately pinpoint below-cost-of-production sales of an *individual product* in one of the company's many markets.

*Id.* at 249, 575 F.Supp. at 1281 (emphasis supplied).

Thus, Commerce requires a company specific standard for initiation of a cost of production investigation. In the case at hand, the record is more producer-specific than the information that was before the court in *Al–Tech,* because it refers to Koyo's business losses, rather than the losses of producers generally. Nevertheless, the information is not product specific in that it does not specifically link losses to

the TRBs in issue. Thus, for these reasons, in recalculating the dumping margins for April 1, 1978 to March 31, 1979, Commerce should do so without reference to the investigation of below-cost-of-production sales.

### B. *Twenty Percent Cap*

■ The parties are also in agreement that the case should be remanded to Commerce for application of the twenty percent cap at the end rather than at the beginning of the model selection process. When selecting similar merchandise, such merchandise must be approximately equal in commercial value to the merchandise under investigation. 19 U.S.C. § 1677(16)(B). In this case, after determining the criteria for comparing or matching TRB models in the two markets, Commerce added a twenty percent cost cap in order to ensure that the home market model chosen is of approximately equal commercial value with the U.S. model. *Final Results*, 55 Fed.Reg. at 22,369. The application of the cost cap at the beginning of the selection process resulted in the use of constructed values rather than sales prices for a larger number of home market models than would have been applied at the end of the selection process.

Congress has expressed a preference for calculating foreign market value based upon the price of the merchandise in the home market rather than upon its constructed value. 19 U.S.C. § 1677b(a)(1) and (2). Therefore, the twenty percent cost cap shall be applied at the end rather than at the beginning of the model selection process.

### 4. Best Information Available

Plaintiffs also claim that Commerce's use of "best information available" and its calculation of foreign market value by rejecting Koyo's reported home market discounts was arbitrary, unsupported by substantial evidence and otherwise not in accordance with the law.

In *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1574 (Fed.Cir.1990), the Court of Appeals held that Commerce was unjustified in resorting to best information available when there was no indication that there was noncompliance with any information requests. The court held that "section 1677e(b) clearly requires *noncompliance with an information request* before resort to the best information rule is justified, whether due to refusal or mere inability." *Id.* (emphasis in original); *Daewoo Elecs. Co. v. United States*, 13 CIT 253, 265, 712 F.Supp. 931, 944 (1989).

Furthermore, the Court of Appeals has stated that the best information rule is

> an investigative tool, which that agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest. One may as well view the rule, in light of the legislative history cited, as a club over the ITC's head, which Congress has brandished to force that agency to arrive at *some* determination within the time allotted. "Impossible" is a word which Congress does not want to hear in these complex cases.

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Fed.Cir.1984) (emphasis in original).

Koyo specifically contests several of Commerce's uses of best information available. Based on this opinion, some of these claims are now moot; for example, Commerce's use of best information available in lieu of master lists.

■ Koyo claims that they failed to keep records due to the inordinate time elapsed during this investigation and because they were under the impression that a revocation was in order. AR (Conf.) Doc. 320. Koyo further claims that Commerce's use of best information available in these situations would penalize Koyo for not maintaining records. Commerce's extraordinary delay, however, is no reason for Koyo to destroy records in an ongoing investigation. Furthermore, while Koyo may have been justified in expecting a revocation, it was never confirmed. Under these circumstances, Koyo should have retained their records. Therefore, Commerce is faced with no other alternative than to apply best information otherwise available when Koyo

is unable to produce information that no longer exists. Commerce, however, should not use the best information rule punitively since there is no evidence that Koyo intentionally failed to comply with Commerce's data requests.

■ It is well-established that Commerce is granted broad discretion in determining what constitutes best information available. *Chemical Prods. Corp. v. United States*, 10 CIT 626, 632–34, 645 F.Supp. 289, 294–96, *remand order vacated*, 10 CIT 819, 651 F.Supp. 1449 (1986). Furthermore, Commerce may disregard information submitted by a party for the relevant period and use other information if it is the best information available. *Rhone Poulenc, Inc. v. United States*, 13 CIT 218, 224, 710 F.Supp. 341, 346 (1989), *aff'd*, 899 F.2d 1185 (Fed.Cir.1990); *Uddeholm Corp. v. United States*, 11 CIT 969, 971, 676 F.Supp. 1234, 1236 (1987).

In this case, Koyo claims that Commerce abused its discretion in using best information available for United States inventory turnover for the periods July 1976 to November 1977 and January 1978 to June 1978. This issue is partially moot in light of this court's decision to have liquidated all entries entered between April 1, 1974 and September 30, 1977 in accordance with existing master lists. The period from October to November 1977, and January to June 1978, however, remains at issue. Koyo claims that in its Final Results, Commerce unfairly penalized Koyo by adding forty-five days instead of thirty days for the time of shipment from Japan to the number of days in inventory. *See Plaintiffs' Motion* at 84–85. This length of time, however, was verified to be thirty days. AR (Conf.) Doc. 232. Therefore, Commerce was not justified in using the forty-five days and on remand it should use thirty days.

As additional best information available, Commerce calculated inventory turnover for the same period, July 1976 through November 1977 and January 1978 through June 1978, based on the longest number of days merchandise was in inventory for any month during December 1977 through

March 1979. *See Final Results*, 55 Fed. Reg. at 22,376–77, Comment 34. Plaintiffs, however, were unable to submit any other data on point. Thus, Commerce was compelled to use the best information otherwise available.

■ Koyo also contests Commerce's use of best information available for United States brokerage, freight-in, and freight-out charges for the entire period. Koyo claims that Commerce rejected Koyo's data because it was not on computer tape. Koyo's data, however, was incomplete and was not in the correct format and therefore, Commerce was justified in using best information otherwise available.

■ Furthermore, Koyo contests Commerce's use of best information available in its calculation of the United States duty rate by ignoring data timely submitted by Koyo. Two months prior to the issuance of the preliminary results, Koyo submitted data for net weights of certain TRBs to calculate the United States duty rates. Commerce dismissed this data as untimely. AR (Conf.) Doc. 304. In light of Commerce's inexcusable delay in proceeding with this investigation and its changes in methodologies, Koyo's submission of this data two months before the final results were issued is reasonable. *See Olympic Adhesives*, 899 F.2d at 1574. Thus, there was no need for Commerce to invoke the best information rule, and on remand Commerce should use Koyo's data for the net weights of these TRBs.

Koyo's final contest with Commerce's selection of best information available states that Commerce erred in using best information for United States foreign inland freight, ocean freight, marine insurance and brokerage for the period April 1974 to April 1978. Koyo's submission of data, however, was not in the correct format and thus, Commerce was justified in selecting best information available.

### CONCLUSION

In accordance with the foregoing opinion, this case is remanded with instructions that all entries entered between April 1, 1974

through September 30, 1977 shall be liquidated in accordance with the existing master lists. Furthermore, all entries entered between October 1, 1977 through March 31, 1979, shall be recalculated pursuant to the three criteria methodology for determining "such or similar" merchandise. In recalculating the dumping margins for the entries from April 1, 1978 to March 31, 1979, Commerce must do so without reference to the investigation of below-cost-of-production sales; and the twenty percent cost cap shall be applied at the end rather than at the beginning of the model selection process. Furthermore, Commerce's use of "best information available" was reasonable in all respects except when it disregarded Koyo's data for net weights of certain TRBs for use in calculating duty rates, and when it added forty-five days for the shipping time. Thus, in its recalculations Commerce must use Koyo's data for the net weights and must apply thirty days for the shipping time. Commerce shall report the results of the remand determination to this Court within ninety (90) days of the date this opinion is entered.

## JUDGMENT

This case having been duly submitted for decision following plaintiffs' motion for judgment on the agency record, and the Court, after due deliberation, having rendered a decision herein; now therefore, in accordance with said decision,

IT IS HEREBY ORDERED that plaintiffs' motion is granted in part and this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), and all entries entered between the period April 1, 1974 and September 30, 1977 shall be liquidated in accordance with existing master lists; and it is further

ORDERED that plaintiffs' motion is denied in part and this case is remanded to Commerce with instructions as set forth below, and Commerce shall recalculate all entries entered between October 1, 1977 and March 31, 1979, pursuant to the three criteria methodology for determining "such or similar" merchandise; and it is further

ORDERED that in recalculating the dumping margins for the entries from October 1, 1977 to March 31, 1979, Commerce must do so without reference to the investigation of below-cost-of-production sales; and it is further

ORDERED that in its recalculations, Commerce must apply the twenty percent cost cap at the end rather than at the beginning of the model selection process; and it is further

ORDERED that Commerce shall recalculate the duty rates using information supplied by plaintiffs for net weights of certain TRBs for use in calculating duty rates; and it is further

ORDERED that in its calculations, Commerce shall use 30 days instead of 45 days for the shipping time; and it is further

ORDERED that Commerce's use of "best information available," in all other respects, was supported by substantial evidence and otherwise in accordance with law; and it is further

ORDERED that Commerce shall report the results of the remand to this Court within ninety (90) days of the date this judgment is entered.

## OPINION AND ORDER ON DENIAL OF REHEARING

The Timken Company ("Timken") moves for a rehearing of *Koyo Seiko Co. v. United States*, for which this Court issued an opinion and judgment, 16 CIT ——, 796 F.Supp. 517, (1992). Specifically, Timken moves for reconsideration of this Court's order that in recalculating the dumping margins for the entries from April 1, 1978 to March 31, 1979, Commerce must do so without reference to the investigation of below-cost-of-production sales.

Timken first alleged that Koyo's home market sales were below the cost of production on September 19, 1983. Administrative Record ("AR") (Pub.) Doc. 194. Ten days later, the Department of Commerce, International Trade Administration ("Commerce"), commenced a below-cost investigation for Koyo's 1978–79 sales and sent Koyo a questionnaire requesting de-

tailed cost data. AR (Pub.) Doc. 198. Koyo objected to the initiation of the below-cost investigation on the grounds that Timken had failed to provide reasonable grounds to suspect there were sales below cost and that a below-cost investigation at that point would be a redundant and unfairly burdensome exercise that would unduly delay the already overdue preliminary determination. Koyo sent a letter to Commerce after this Court issued its decision in *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 575 F.Supp. 1277 (1983), *aff'd*, 745 F.2d 632 (Fed.Cir.1984),[1] and it referred specifically to the standard as articulated in *Al Tech.* Despite Koyo's concerns, however, Commerce did not discontinue the below-cost investigation. In its final results, Commerce again disagreed with Koyo and deemed Timken's cost allegations sufficient. *See Tapered Roller Bearings Four Inches or Less in Outside Diameter From Japan; Final Results of Antidumping Duty Administrative Review*, 55 Fed.Reg. 22,369, 22,376 (Comment 32) (1990).

Before this Court, Koyo again raised the issues that Timken's below-cost allegations were factually insufficient and untimely. In its response, the government agreed with Koyo that the below-cost investigation should not have been initiated and consented to a remand for recalculation of the entries in question without reference to the below-cost-of-production sales. In its reply memorandum, however, Timken requested the Court to take note of certain evidence of record and deny the government's request for a remand.

In the alternative, Timken requested the opportunity to add new evidence on remand. The Court did not grant these requests, but rather ordered a remand to Commerce to recalculate the dumping margins from April 1, 1978 to March 31, 1979

"without reference to the investigation of below-cost-of-production sales." *Koyo Seiko*, 16 CIT at ——, 796 F.Supp. at 524–25. On August 12, 1992, this Court granted defendant's consent motion for an extension of time to August 28, 1992 to file its remand results.

Timken now moves for a rehearing of the cost of production issue or alternatively for leave to amend its cost of production allegations.

## DISCUSSION

It is within the sound discretion of the Court to grant or deny a party's motion for rehearing. *See Reynolds Trading Corp. v. United States*, 496 F.2d 1228, 1230 (1974); *Channel Master, Div. of Avnet, Inc. v. United States*, 11 CIT 876, 877, 674 F.Supp. 872, 873 (1987), *aff'd*, 856 F.2d 177 (Fed.Cir.1988); *Oak Laminates Div. of Oak Materials Group v. United States*, 8 CIT 300, 302, 601 F.Supp. 1031, 1033 (1984), *aff'd*, 783 F.2d 195 (Fed.Cir.1986). Pursuant to Rule 59(a)(2) of the Rules of this Court, it is incumbent upon the Court to consider whether the movant is entitled to a rehearing under the principles of equity. *See* USCIT R. 59(a)(2)[2]; *see also St. Regis Paper Co. v. United States*, 13 CIT 992, 993, 1989 WL 154287 (1989).

A rehearing "is a method of rectifying a significant flaw in the conduct of the original proceeding." *V.G. Nahrgang Co. v. United States*, 6 CIT 210, 211, 1983 WL 2203 (1983) (citing *W.J. Byrnes & Co. v. United States*, 68 Cust.Ct. 358 (1972)). Furthermore, in ruling on a petition for rehearing, a court's previous decision will not be disturbed unless it is "manifestly erroneous." *United States v. Gold Mountain Coffee, Ltd.*, 9 CIT 77, 78, 1985 WL 25753 (1985).

> A new trial or rehearing may be granted to all or any of the parties and on all or part of the issues ... (2) in an action tried without a jury *or in an action finally determined*, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. [Emphasis in original.]

---

**1.** In *Al Tech*, the Court held that there must be "a particularized and objective basis for suspecting" that a particular foreign firm is engaged in home market sales at prices below its cost of production. 6 CIT at 247, 575 F.Supp. at 1280.

**2.** Rule 59(a)(2) of the Rules of this Court states in pertinent part:

A rehearing may be proper when there has been

some error or irregularity in the trial, a serious evidentiary flaw, a discovery of important new evidence which was not available, even to the diligent party, at the time of trial, or an occurrence at trial in the nature of an accident or unpredictable surprise or unavoidable mistake which severely impaired a party's ability to adequately present its case.

*W.J. Byrnes*, 68 Cust.Ct. at 358.

In this action, Timken has failed to demonstrate any of the grounds which would justify the granting of its motion for rehearing on the cost of production issue. Timken argues that the Court ignored evidence of record. However, it fails to show that the Court's previous decision was "erroneous." Timken specifically called the Court's attention, in its memoranda in this case, to the only evidence of record. This Court already has reviewed this evidence prior to deciding this case and was not convinced by Timken's arguments.

██ Timken argues that the Court retroactively applied *Al Tech* to this case. *See* Timken's *Memorandum in Support of Motion for Rehearing and Motion for Leave to Amend Cost of Production Allegations* at 7. This allegation is futile because *Al Tech* merely clarifies a general evidentiary standard for reviewing below-cost allegations, rather than establishing a new methodology for Commerce to apply. *See Al Tech*, 6 CIT 245, 575 F.Supp. 1277.

Pursuant to 19 U.S.C. § 1677b(b) (1988 and 1992 Supp.), the ITA shall investigate a foreign manufacturer's cost of production "[w]henever [it] has reasonable grounds to believe or suspect that sales in the home market ... have been made at prices which represent less than the cost of producing the merchandise in question...." The phrase "reasonable grounds to believe or suspect" is not self defining. The court in *Connors Steel Co. v. United States*, 2 CIT 242, 527 F.Supp. 350 (1981), clarified this

standard as a general evidentiary threshold amounting to "less than the probable cause needed to secure a search warrant." *Id.* at 248, 527 F.Supp. at 357. *Al Tech* merely provides guidance in requiring "a *particularized* and *objective* basis for suspecting" that a particular foreign firm is engaged in home market sales at prices below its cost of production. *Al Tech*, 6 CIT at 247, 575 F.Supp. at 1280 (emphasis supplied). A new methodology was not created.

Moreover, Koyo Seiko Co. and the Department of Commerce consented that this case should be remanded for recalculation of dumping margins for the period April 1, 1978 to March 31, 1979 without reference to the investigation of below-cost-of-production sales. Therefore, for the foregoing reasons, Timken's motion for rehearing is denied.

*Motion to Amend Pleadings Under Rules 15(a) or 15(b)*

██ Alternatively, Timken requests that this Court, pursuant to Rules 15(a) or 15(b) of the Rules of this Court, permit it to amend or supplement its 1983 below-cost allegations against Koyo during the remand of this case. Koyo Seiko, however, claims that this would prejudice them as they would not be able to fairly defend themselves due to the lengthy passage of time.

The Supreme Court, in *Foman v. Davis*, held that under Rule 15(a)[3], the requirement that leave to amend pleadings must be freely given, must be balanced against numerous considerations protecting the rights of the opposing party. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The Court must consider whether there was "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *See id.; see also Saint Paul Fire & Marine Ins. Co. v.*

---

**3.** Rule 15(a) of the Rules of this Court states in pertinent part:

[A] party may amend the party's pleading only by leave of court or by written consent

of the adverse party; and leave shall be freely given when justice so requires.

*United States*, 16 CIT ——, ——, 795 F.Supp. 453, 455 (1992); *The Timken Co. v. United States*, 15 CIT ——, ——, 779 F.Supp. 1402, 1403–04 (1991).

The United States Court of Appeals for the Federal Circuit recently stated that "[a]lthough delay itself is an insufficient ground to deny amendment, if the delay is 'undue' the district court may refuse to permit amendment." *Datascope v. SMEC, Inc.*, 962 F.2d 1043, 1045 (Fed.Cir.1992). The Court of Appeals has also stated that a "litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend." *Tenneco Resins, Inc. v. Reeves Bros., Inc.*, 752 F.2d 630, 634 (Fed. Cir.1985) (citing *Carson v. Polley*, 689 F.2d 562, 584 (5th Cir.1982)); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 327 n. 1, 91 S.Ct. 795, 800 n. 1, 28 L.Ed.2d 77 (1971); *Saint Paul*, 795 F.Supp. at 455.

This request by Timken to amend its original below-cost allegations takes place thirteen years after the last entry in this case. Timken had ample opportunity to introduce new evidence and failure to do so was at its peril.

It is prejudicial to require a party to defend allegations made several years later, particularly since the moving party had every opportunity to seek amendments to its allegations at an earlier time. A trial court also "may properly consider the possibility of prejudice to a party stemming from the burden of additional discovery after a long delay." *Tenneco*, 752 F.2d at 634 (citing *Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (6th Cir. 1973), *cert. denied*, 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974)). This delay would cause unfair prejudice to Koyo Seiko as Timken's new allegations would be an unfair surprise to the defending party. Therefore, plaintiff's motion to amend its allegations under Rule 15(a) is denied.

Similarly, Timken moves under Rule 15(b) of the Rules of this Court. Rule 15(b) permits amendments to conform to the evidence when:

[ (1) ]  issues not raised by the pleadings are tried by express or implied consent of the parties ... [or (2) when] the evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings ... [but] the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

USCIT R. 15(b). Timken fails to satisfy either of these conditions. Furthermore, any amendments at this point in time would be unduly prejudicial to the defending party as discussed above.

*Supplemental Information*

■  At the same time, however, during the administrative proceeding, Commerce was satisfied with Timken's allegation of below-cost-of-production sales despite the *Al Tech* decision and never indicated to Timken that the allegation was in any way unsatisfactory. In fact, the record indicates that Commerce found Timken's allegation satisfactory despite Koyo's objections. The first time that Timken was advised of Commerce's dissatisfaction with Timken's allegation was when the government filed its memorandum in partial opposition to Koyo's motion for judgment upon the administrative record. Thus, Timken never had any reason to supplement the allegation. The government's 1992 request for a remand for recalculation of the dumping margin without reference to the cost of production investigation was in the nature of an unpredictable surprise which impaired Timken's ability to adequately present its case with respect to the alleged below-cost-of-production sales.

For the foregoing reasons and in the interests of justice, Slip Op. 92–72 and the accompanying judgment should be modified to permit Timken, within ten days of the date this opinion is entered, to supplement its allegation of below-cost-of-production sales with information not derived from Commerce's investigation of below-cost-of-production sales and to permit Commerce to consider the supplemental infor-

mation, in order to determine whether the dumping margins for the April 1, 1978 to March 31, 1979 period should be recalculated without reference to the investigation of below-cost-of-production sales.

## CONCLUSION

Timken's motion for rehearing is denied as this Court's earlier decision was neither "significantly flawed" nor "manifestly erroneous." Furthermore, Timken's request to amend its 1983 allegations on remand is also denied since its request has been unduly delayed, and Koyo Seiko would otherwise be prejudiced in its ability to defend its case. Timken, however, within ten days from the date this opinion is entered, may supplement its allegation of below-cost-of-production sales with information not derived from Commerce's investigation of below-cost-of-production sales. Subsequently, Commerce is ordered to submit remand results to this Court within twenty days of the date of this order.