**ATLANTIC SUGAR, LTD., et al., Appellees,**

v.

**The UNITED STATES and Amstar Corporation, Appellants.**

**Appeal Nos. 84–692, 84–709.**

United States Court of Appeals, Federal Circuit.

Sept. 25, 1984.

---

Michael H. Stein, Washington, D.C., argued for appellant. With him on the brief were Michael P. Mabile, Asst. General counsel and William E. Perry, Washington, D.C.

Thomas P. Ondeck, Washington, D.C., argued for appellant, Amstar Corporation. With him on the brief was B. Thomas Peele, Washington, D.C.

Roger D. Chesley, Washington, D.C., of counsel.

Roger A. Clark, Washington, D.C., argued for appellee. With him on the brief was Robert V. McIntyre, Washington, D.C.

Before MILLER, Circuit Judge, COWEN, Senior Circuit Judge, and SMITH, Circuit Judge.

EDWARD S. SMITH, Circuit Judge.

In this antidumping case, appellants, the United States (Government) and Amstar Corporation (Amstar), appeal from a Court of International Trade decision reversing an affirmative determination by the U.S. International Trade Commission (ITC) of regional industry injury, and vacating the resulting antidumping order. We reverse and reinstate the antidumping order.

### Issues

We address two issues: (1) whether the lower court erred as a matter of law in holding that the aggregate data for Revere Sugar Corporation (Revere) did not constitute "best information available";[1] and (2) whether the lower court erred in finding that the ITC injury determination was unsupported by substantial evidence on the record.

---

1. 19 U.S.C. § 1677e(b) (1982) set forth in opinion *infra*. All section references are to title 19,

*Background*

We have before us the most recent[2] of five Court of International Trade decisions[3] concerning this Canadian sugar antidumping case. The case began in March 1979 when United States sugar producer Amstar filed an antidumping petition with the U.S. Treasury Department, alleging injury by reason of "dumped" imports of Canadian sugar (imports sold at less than fair value) and requesting relief in the form of antidumping duties on those imports.[4] Treasury exercised its right, under the law then in effect, to refer the case to the ITC for a preliminary injury assessment. In May 1979 the ITC determined that sufficient evidence of injury existed to warrant Treasury's continued investigation of the alleged dumping. In reaching this determination the ITC focused on data for injury to a regional, as opposed to a nationwide, sugar industry located in the Northeastern/Great Lakes area.

In early November 1979 Treasury found sales at less than fair value, with dumping margins on the Canadian sugar of approximately 20 percent. Consequently, the ITC promptly instituted its final injury investigation. Then, on January 1, 1980, the Trade Agreements Act of 1979[5] became effective, providing 75 days for the ITC to make a final material injury determination in any pending antidumping case.[6] More importantly, the new law specified precisely the criteria which the ITC was to apply in defining a regional industry:[7]

(C) Regional industries

In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—

 (i) the producers within such market sell all or almost all of their production of the like product in question in that market, and

 (ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

In such appropriate circumstances, material injury * * * of an industry may be found to exist with respect to an industry * * * if there is a concentration of * * * dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured * * by reason of the * * * dumped imports.

During the final injury investigatory period the ITC staff endeavored to collect the extensive data necessary to determine whether a northeastern states' sugar industry existed which satisfied the above new, strict statutory definition, and, if so, what should be the scope of the region. This involved, among many other things, mailing questionnaires to the seven sugar producers in the suspected region, including the second largest, Revere. Revere's questionnaire, dated January 7, 1980, showed that Revere had three plants, located in Brooklyn, Boston, and Chicago. Rev-

---

U.S.C. (1982), except where otherwise indicated.

**2.** *Atlantic Sugar, Ltd. v. United States,* 573 F.Supp. 1142 (Ct.Int'l Trade 1983) (*Atlantic Sugar V*).

**3.** *See* previous Court of International Trade opinions of same title as n. 2 found at 553 F.Supp. 1055 (1982) (*Atlantic Sugar IV*); 2 C.I.T. 295 (1981) (*Atlantic Sugar III*); 519 F.Supp. 916, 2 C.I.T. 18 (1981) (*Atlantic Sugar II*); 511 F.Supp. 819, 1 C.I.T. 211 (1981) (*Atlantic Sugar I*).

**4.** Amstar filed under the then-applicable statute, the Antidumping Act of 1921, as amended (§§ 160 *et seq.* (repealed effective Jan. 1, 1980)), which provided for investigation of alleged less-than-fair-value imports by the Treasury Depart-

ment. The ITC conducted the parallel injury investigation, as it does under current law. §§ 1673 *et seq.* Both investigations must result in affirmative determinations in order for the United States petitioner to receive the requested relief.

**5.** Pub.L. No. 96–39, 93 Stat. 144, 162, repealing the Antidumping Act of 1921 (§§ 160 *et seq.*) and amending the Tariff Act of 1930 to insert the new antidumping statute at §§ 1673 *et seq.*

**6.** Section 102 of Pub.L. No. 96–39, set forth at § 1671.

**7.** Section 1677(4)(C).

ere gave the ITC confidential firm-wide data (*i.e.*, aggregated for all three plants) covering such information as Revere's production, sales, distribution of net sales (broken out by northeastern as opposed to other states), and profit-and-loss and other financial data.

By the end of January 1980 the ITC staff, in its report containing preliminary findings of fact, proposed an 11-state northeastern area excluding Illinois and Maryland. This meant that Revere's Chicago plant would be excluded from the region, as well as the Baltimore and Chicago plants of the proposed region's largest producer, Amstar. The ITC staff then worked with Amstar to segregate its data to exclude its plants outside the region. The staff did not do this with Revere, but toward the end of the investigatory period the principal staff investigator did telephone Revere to inquire about individual plant data. According to an affidavit by that investigator, Revere officials told him that "separate data on individual plant operations were not readily available." He also stated that Revere's president told him that the Chicago operation was "relatively minor" compared with the Boston and Brooklyn operations and that the Chicago operations were "not significantly different" from those of the other two plants.

The ITC staff presented its final report to the commissioners, and on March 6, 1980, they unanimously determined that an industry in the United States was being materially injured by reason of imports of sugars and syrups from Canada, which Treasury had determined to be sold in the United States at less than fair value. The commissioners defined the sugar "industry" according to the new statutory criteria and as recommended by the staff—the 11-

state northeastern area. However, in the data on which the commissioners based their decision were the firm-wide Revere figures, which included the extra-regional Chicago plant. In *Atlantic Sugar V* the Court of International Trade held inclusion of the Chicago plant data to be contrary to law and to cause the ITC's final injury determination to be unsupported by substantial evidence, resulting in that court's vacating the final antidumping order. We review these aspects of that court's decision.[8]

## OPINION

The statute specifies that the standard of judicial review of a final ITC material injury determination in an antidumping case is whether that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."[9] We therefore apply the substantial evidence standard in reviewing the ITC's factual determination that an industry in the United States was materially injured by reason of Canadian sugar sold in the United States at less than its fair value.[10] We address first, however, the alleged error of law concerning the trial court's rejection of the aggregate data for Revere's three plants as not in accordance with law.

### 1. *Best Information Otherwise Available*

The Government and Amstar contend that the ITC did not err in including the Chicago plant data in its injury determination, because the aggregate Revere data was the "best information otherwise available," as allowed by statute:[11]

(b) Determinations to be made on best information available

---

**8.** We do not review the various other issues which that court addressed in *Atlantic Sugar I, II, III, IV*, and *V*, and which the parties have not here appealed, except that we do note some points where relevant.

**9.** Section 1516a(b)(1)(B).

**10.** Our jurisdiction of the lower court's opinion on this matter is found at 28 U.S.C.

§ 1295(a)(5), granting us exclusive jurisdiction "of an appeal from a final decision of the United States Court of International Trade." We review that court's review of an ITC determination by applying anew the statute's express judicial review standard.

**11.** Section 1677e(b).

In making their determinations under this subtitle, the * * * Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

Atlantic Sugar, a Canadian sugar producer, counters that the ITC should not benefit from the best information available rule because, to summarize, it was the ITC's own fault that Revere was "unable to produce [the] information requested in a timely manner and in the form required," as the statute states. The lower court rejected the applicability of the rule because the fact that segregated Revere data was not readily available "cannot be said to rise to the level of a refusal or inability to provide the requested information or a significant impediment, particularly given the critical importance of regional data to a regional investigation." [12]

Before analyzing further the parties' and lower court's views, we examine the rule itself, set forth above. We note the use of the mandatory term "shall," indicating that the ITC *must* use the best information otherwise available in the enumerated circumstances. This is reflected in the legislative history: [13]

[This section] would provide that whenever a party or any other person refuses or is unable to produce information in a timely manner and in the form required, or otherwise significantly impedes an investigation, * * * the ITC *must* use the best information otherwise available. [Emphasis supplied.]

We also note the context of the best information rule: it is set within the extremely short statutory deadlines which the Congress built into the new antidumping law [14] and the resultant lack of time which

the ITC has to wield its little-used subpoena power. [15] Thus cooperation by the parties to the investigation is essential, as well as diligence by the ITC staff, to gather the data needed for an accurate determination. Noncooperation by parties or other persons may, in the absence of ITC time to pursue judicial compliance, be penalized, at least in the eyes of those parties or persons, by the ITC's mandatory use of whatever other best information it may have available. In short, one may view the best information rule, as the ITC urges, as an investigative tool, which that agency may wield as an informal club over recalcitrant parties or persons whose failure to cooperate may work against their best interest. One may as well view the rule, in light of the legislative history cited, as a club over the *ITC's* head, which Congress has brandished to force that agency to arrive at *some* determination within the time allotted. "Impossible" is a word which Congress does not want to hear in these complex cases.

With this in mind, we address more closely Atlantic Sugar's contentions that the ITC staff acted negligently in not requesting plant-by-plant data from Revere until near the end of the investigatory period, especially when it was clear since the May 1979 preliminary ITC injury determination that the ITC would need northeastern regional industry data, excluding Chicago. Moreover, Atlantic Sugar stresses that Revere's questionnaire response, which the ITC received in early to mid-January 1980, showed that Revere's sales outside the northeastern region had decreased, on a percentage basis, far more than those within the region. This should have caused the ITC staff to suspect that Revere's Chicago plant was worse off than the Boston and Brooklyn plants, Atlantic contends, thus distorting and pulling downward the firm-

---

12. *Atlantic Sugar V,* 573 F.Supp. at 1145.

13. S.REP. NO. 249, 96th Cong., 1st Sess. 98, *reprinted in* 1979 U.S.CODE CONG. & AD.NEWS 381, 484.

14. The Senate Report states that "a major objective of this revision of the antidumping duty law is to reduce the length of an investigation." *Id.,* S.REP. NO. 249 at 75, 1979 U.S.CODE CONG. & AD.NEWS at 461.

15. Section 1333.

wide statistics.[16] Finally, Atlantic argues that there was no reason why the ITC staff could not obtain such plant-by-plant data from Revere, when it could and did obtain it from the region's largest producer, Amstar.[17]

While it may be true that the ITC staff might have been more aggressive in pursuing plant-by-plant data for Revere as it did with Amstar, we are not here reviewing the ITC's diligence. Nothing in the best information rule or its legilsative history defines a standard of investigative thoroughness.[18] Rather, Atlantic Sugar's concerns go to the question of the evidence on the record for the injury determination, as discussed below. If that evidence is insubstantial, then the reviewing court must either reverse the ITC's determination or remand the case for further fact-finding. Implicit in such a reversal or remand would be the reviewing court's finding that some person or institution, whether the parties or ITC or all, inadequately collected and/or interpreted the data.

The lower court's analysis of the best information rule also bears further discussion. That court simply did not believe that Revere was "unable" to provide the Chicago plant data. It rejected Revere's position that such data was "not readily available," because (1) "it is reasonable to expect that a large corporation such as Revere would maintain records of the separate operations of its plants" and (2), since a separate region was found, "it is reasonable to expect that data reflecting this separation would be readily ascertainable from those who are producers in the region."[19]

These views, however, are founded neither in the record nor in business and accounting reality. Amstar, the region's largest sugar producer, did not keep all its data on a plant-by-plant basis, necessitating extensive work by the ITC staff in separating the information. There is no reason why Revere, the region's second largest producer, should have so segregated its data, especially that which would have been most useful to the ITC on a plant-by-plant basis, profit and loss figures. As the ITC points out, many corporations, while collecting cost data by plant, calculate revenue and hence profit only on a company-wide basis, particularly where company marketing, sales, administrative, and management expenses are centralized. Moreover, it is inflating out of all proportion the importance of the laws with which the lower court deals to expect that business people and corporate accountants would keep their books with an eye to an obscure and wholly arbitrary statutory geographic region, which a relatively small Government agency might declare for the purposes of one antidumping injury investigation.

The lower court nevertheless went on to hold:[20]

[E]ven if Revere was unable or unwilling to provide the regional data [excluding its Chicago plant], the information used by the ITC still does not constitute proper evidence. It is not simply weaker evidence substituted for stronger evidence. It is irrelevant and immaterial data substituting for evidence. *Its usefulness has been completely destroyed by the inclusion of the Chicago plant.* [Emphasis supplied.]

We see no basis for such an extreme conclusion. The lower court mentions the statutory regional industry provision, set forth above, as providing a "proscription against the use of data" from outside the

16. At the time the ITC was gathering this data it expected it could use its traditional aggregation approach, rather than the piecemeal methodology mandated by the lower court in *Atlantic Sugar III. See* discussion in part 2 *infra.*

17. Amstar apparently possessed a head start in this type of data segregation because it had filed for trade adjustment assistance, necessitating a somewhat similar proof of injury. Sections 2271 *et seq.*

18. *Cf.* discussion in *Haarman & Reimer Corp. v. United States,* 1 C.I.T. 207, 209–10 (1981), and *Budd Co. Ry. Div. v. United States,* 507 F.Supp. 997, 1003–04, 1 C.I.T. 67 (1980), remanding to the ITC for further fact-finding.

19. *Atlantic Sugar V,* 573 F.Supp. at 1145.

20. *Id.*

region.[21] This is error, however, as that statute not only contains no such proscription but on its face stresses the need for intelligent approximations—*e.g.*, producers who "sell all or almost all of their production"; demand which is "not supplied, to any substantial degree"; producers of "all, or almost all, of the production." [22]

In short, by rejecting all the Revere data, and from there the entire injury determination, because of the inclusion of figures for the Chicago plant, the lower court has thrown the baby out with the bath water. This is not an application of the best information rule, but rather an evidentiary and factual determination which the lower court should have made according to the substantial evidence standard, discussed below. We therefore hold that the ITC acted in accordance with law by invoking the best information rule, and, to the extent that the lower court has held otherwise, we reverse.

### 2. *Substantial Evidence on the Record*

Substantial evidence on the record means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence.[23] We therefore state the issue before us as whether the ITC's inclusion of the Revere Chicago plant data in its final affirmative determination of material injury to the United States sugar industry, defined to be a northeastern industry, by reason of dumped Canadian imports, so distorts or detracts from the evidence in favor of injury, as to render that evidence insubstantial on the record.

We note first the influence on this case of the methodology which the lower court declared to be required by law in a regional industry injury determination. In *Atlantic Sugar III* that court held that the statutory language "producers of all, or almost all, of the production within that [regional] market" [24] requires the ITC to examine each individual regional producer to determine if it is injured, exclude those that are not injured, and then examine those remaining to determine if they constitute "all, or almost all" of the producers.[25] This piecemeal approach differs sharply from the aggregation method which the ITC has traditionally used in both nationwide and regional injury determinations. Nevertheless, the ITC, though disagreeing strongly with the lower court's view,[26] complied with it. Because the parties have not squarely raised this issue on appeal,[27] we analyze the injury determination within the "piecemeal" framework.

Since Revere produced approximately one-quarter of the sugar in the defined region during the period in question, whether substantial evidence exists for injury to Revere is determinative of the ITC's affirmative finding, assuming the

---

**21.** *Id.* at 1144, citing *Atlantic Sugar IV*, 553 F.Supp. at 1058.

**22.** Section 1677(4)(C).

**23.** *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382, 218 U.S.P.Q. 678, 692 (Fed. Cir.1983), additional comments of Judge Nies, quoting from *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 459, 488, 95 L.Ed. 456 (1951).

**24.** Section 1677(4)(C).

**25.** *Atlantic Sugar III*, 2 C.I.T. at 300.

**26.** *Sugars & Sirups from Canada,* USITC Investigation No. 731–TA–3 (final) (April 1982) (Addi-

tional Views on Regional Industry Analysis), *reprinted in* 47 Fed.Reg. 19,490 (May 5, 1982).

**27.** *See* ITC brief at 16, note 15, specifically declining to raise this matter. Appellant Amstar has raised this issue of law in a footnote in its main brief and in its reply brief; appellee Atlantic Sugar has not raised it. It is unfortunate that the parties have not squarely appealed and briefed the issue, since our review of the statute and legislative history indicates no basis for the lower court's holding. *See* thorough discussion in commissioners' additional views, note 26 *supra,* and the lower court's retreat from the rigidity of its holding in *Atlantic Sugar IV*, 553 F.Supp. at 1059–60.

piecemeal framework discussed above.[28] Evidence of material injury on the record which evidence the ITC found regarding Revere includes: declining sugar production from 1978 to 1979, as well as declining capacity utlization, person-hours worked and productivity, and profits (all including Chicago plant data); declining total sales by Revere plants within the region (excluding Chicago) to regional customers from 1978 to 1979; and consistent underselling by one or both of the Canadian producers, sometimes by substantial margins, from 1978 to 1980.[29]

Evidence on the record detracting from the substantiality of the above includes, most significantly, the possible distorting impact of the Chicago plant figures. This impact may be estimated in several ways. First, the record does show an approximate (business confidential) figure for Revere's Chicago plant production which figure, while not the "small" or "minor" quantity as the ITC and Revere's president have characterized it, is at least less than a third of the aggregate Revere production figures. Thus we may conclude that the Chicago plant is likely smaller than the averaged size of the two northeastern region Brooklyn and Boston plants.[30] Secondly, the sales data, which the ITC did request and Revere did supply on a segregated basis, show that the sales of Revere's Chicago plant declined significantly more than those of the two northeastern plants. Nevertheless, sales of the northeastern plants did decline notably, and in absolute terms about the same amount as the larger regional producer Amstar. Thus, while the Chicago plant may have suffered worse sales declines, the northeastern plants suffered as well. Atlantic Sugar urges that the sharper decline at the Chicago plant would account for most of Revere's aggregate profit loss. This may be so to a

disproportionate degree, but it is still reasonable to expect that the northeastern plants, with declining sales, experienced some declining profits as well. Finally, Atlantic Sugar urges that we reject the information about the Chicago plant provided by Revere's president in response to the ITC analyst's phone call. As reviewing court, we do not presume to weigh the credibility of those statements, but simply recognize their presence on the record as those reported of a businessman speaking generally about his business in both a hurried and self-serving context.

■ In sum, considering as we have, the entire record with its confidential *in camera* evidence, and the points detracting from the substantiality of the evidence for injury to Revere, both as discussed here and as detailed further in Atlantic's briefs, we cannot find that this leaves so little evidence on the record as to be less than a "mere scintilla" or less than that which "a reasonable mind might accept as adequate to support a conclusion." To the contrary, we find that the ITC's determination regarding material injury to Revere is quite reasonable and supported by substantial evidence on the record. Considering the compromise which the ITC must make between a perfectly accurate and an extremely rapid determination under this complex statute, the absence here of the most important missing figures—segregated profit and loss data for the second largest regional producer—is not so debilitating as to render the final determination unsupported under the substantial evidence standard.

We reverse the lower court's finding of insubstantial evidence on the record to support the final ITC material injury determination, reinstate that determination, and

---

**28.** *Atlantic Sugar V,* 573 F.Supp. at 1145. The parties do not contest the ITC's affirmative injury finding for Amstar, the region's largest producer, and two other smaller producers, nor its negative injury finding with regard to two small regional producers.

**29.** *Sugars & Sirups from Canada,* note 26 *supra.*

**30.** When analyzed under the ITC's traditional aggregation approach, rather than under the lower court's piecemeal approach, the Chicago plant represents a very small percentage of the region's total sugar production.

order that the resulting antidumping order be reinstated as well.

REVERSED.