997 F.2d 1453
 15 ITRD 1361
 NTN BEARING CORPORATION OF AMERICA, American NTN Bearing
Mfg. Corp. and NTN Toyo Bearing Co., Ltd.,
Plaintiffs-Appellants,
v.
The UNITED STATES and Ron Brown, Secretary of Commerce,
Defendants-Appellees,
and
The Torrington Co., Defendant-Appellee.
 No. 93-1048.
 United States Court of Appeals,
Federal Circuit.
 June 29, 1993.
 
 Brian F. Walsh, Barnes, Richardson & Colburn, Chicago, IL, argued for plaintiffs-appellants. With him on the brief was Donald J. Unger.
 A. David Lafer, Sr. Trial Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendants-appellees. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director. Of counsel were Berniece A. Browne and Dean A. Pinkert, Dept. of Justice. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin. and Stephen J. Claeys, Atty. Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC.
 James R. Cannon, Jr., Stewart & Stewart, Washington, DC, argued for defendant-appellee. Of counsel were Terence P. Stewart and Eugene L. Stewart.
 Before NEWMAN, CLEVENGER and RADER, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 NTN Bearing Corp. of America, American NTN Bearing Manufacturing Corp. and NTN Toyo Bearing Co., Ltd. (collectively referred to as NTN) appeal the judgment of the United States Court of International Trade denying NTN's motion for judgment on the record and holding that the International Trade Administration of the Department of Commerce (Commerce) properly included NTN's imported antifriction bearing components within the scope of the antidumping order imposed on antifriction bearings imported from Japan. NTN Bearing Corp. of Am. v. United States, 802 F.Supp. 448 (Ct. Int'l Trade 1992). Because the components NTN imports are ultimately sold in the United States and because it was not improper for Commerce to assign the margin calculations for assembled bearings to bearing components, we affirm.
 
 
 2
 * NTN Toyo Bearing Company is a Japanese manufacturer of bearings. Its American subsidiary manufactures finished bearings from, inter alia, bearing components produced by NTN in Japan. In March 1988, the Torrington Company, a manufacturer of bearings in the United States, filed an antidumping petition with Commerce requesting that antidumping duties be imposed on antifriction bearings and parts thereof (other than tapered roller bearings) imported from nine different countries including Japan. (Tapered roller bearings had been the subject of previous antidumping investigations. E.g., Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From Japan, 52 Fed.Reg. 47,955 (Dep't Comm. Dec. 17, 1987) (final less-than-fair value determination).) In order for an antidumping duty order to be imposed on imports of antifriction bearings from Japan, Commerce would have to determine that these imports were sold in the United States at less-than-fair value and the United States International Trade Commission (ITC) would have to determine that the imports injured a domestic industry. 19 U.S.C. § 1673 (1988).
 
 
 3
 In April 1988, Commerce initiated multiple antidumping investigations to determine whether imports of antifriction bearings from the nine countries were being sold at less-than-fair value. E.g., Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From Japan, 53 Fed.Reg. 15,076 (Dep't Comm. Apr. 27, 1988) (initiation notice). The ITC likewise instituted preliminary and final investigations to determine whether U.S. industries were injured by reason of those imports. Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From the F.R.G., Fr., Italy, Japan, Rom., Sing., Swed., Thail., & the U.K., 53 Fed.Reg. 11,917 (USITC Apr. 11, 1988) (institution of prelim. investigations); Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From the F.R.G., Fr., Italy, Japan, Rom., Sing., Swed., Thail., & the U.K., 53 Fed.Reg. 50,304 (USITC Dec. 14, 1988) (institution of final investigations). These antifriction bearings antidumping investigations were an enormous administrative undertaking for both agencies, encompassing five different classes or kinds of antifriction bearings imported from nine countries affecting six different domestic industries producing antifriction bearings. Due to the massive number of sales transactions and the complexity of the investigations, Commerce modified several aspects of its sales reporting requirements for the imported merchandise. Commerce decided, pursuant to 19 C.F.R. § 353.42(b) (1992), that it would seek data on only 33 percent by volume of each respondent's U.S. sales, instead of covering the customary minimum 60 percent of sales. Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From Japan, 53 Fed.Reg. 45,343, 45,345 (Dep't Comm. Nov. 9, 1988) (prelim. less-than-fair value determinations). NTN approved of this rate of sampling. Commerce further decided that importers of bearing components, which assembled the components into completed bearings in the United States before sale to an unrelated purchaser, would not have to provide Commerce with constructive prices for the components at the time of importation. They would supply actual prices for the bearings assembled from those components instead.
 
 
 4
 [W]here U.S. subsidiaries of foreign bearings producers [import] components and parts to be assembled before sale to an unrelated customer in the United States, the respondents [need] only to report (1) the price of the assembled bearing as sold to the unrelated customer, and (2) the price of an identical bearing sold in the relevant foreign market. In other words, the respondents [do] not have to deduct the value added in the United States to arrive at a "constructed" U.S. price of the components and parts in their condition as imported.
 
 
 5
 Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From the F.R.G., 54 Fed.Reg. 18,992, 19,028 (Dep't Comm. May 3, 1988 Appendix B) (final less-than-fair value determinations) (Antifriction Bearings ). During its final investigations, however, Commerce decided to exclude these data from its margins calculations because "not deducting U.S. value added could skew the dumping calculations considerably." Id. at 19,029. Of ultimate importance to NTN, Commerce determined that imports of ball bearings, cylindrical roller bearings, spherical roller bearings, needle roller bearings, spherical plain bearings and parts thereof from Japan were being sold in the United States at less-than-fair value, id. at 19,101, and the ITC found that ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from Japan had caused material injury to a U.S. industry. Antifriction Bearings (Other Than Tapered Roller Bearings) & Parts Thereof From the F.R.G., Fr., Italy, Japan, Rom., Sing., Swed., Thail., & the U.K., 54 Fed.Reg. 21,488, 21,489 (USITC May 18, 1989) (final injury determination). Consequently, Commerce imposed antidumping orders on imports of the three types of bearings--ball, cylindrical roller and spherical plain--as well as parts thereof from Japan that satisfied the requirements of section 1673. These orders included antifriction bearing components imported by NTN. Ball Bearings, Cylindrical Roller Bearings, & Spherical Plain Bearings, & Parts Thereof From Japan, 54 Fed.Reg. 20,904, 20,905 (Dep't Comm. May 15, 1989) (antidumping duty orders). NTN appealed the application of these orders to bearing components to the Court of International Trade.
 
 
 6
 The court identified the central issue of NTN's appeal as whether NTN's components were properly included within the scope of Commerce's investigation. The court concluded that they were. In answering NTN's claim that its components could not be subject to antidumping duties because they were not sold in the United States to an unrelated party until assembled into finished antifriction bearings, the court held that components properly within the scope of Commerce's investigation may be subject to antidumping duties, particularly when the components have no independent application other than to be combined and further refined into completed bearings. NTN Bearing Corp., 802 F.Supp. at 451-53 (relying on the court's similar decision regarding imports of tapered roller bearing components in NTN Bearing Corp. of Am. v. United States, 747 F.Supp. 726, 731-32 (Ct. Int'l Trade 1990) and this court's decision in Samsung Elecs. Co. v. United States, 873 F.2d 1427 (Fed.Cir.1989)). The court also upheld Commerce's decision to exclude NTN's components from the agency's dumping margin calculation because it was a reasonable decision fully explained at the administrative level. Id. at 453.
 
 
 7
 On appeal, NTN contends that the Court of International Trade misconstrued its challenge to Commerce's authority to impose an antidumping order on components. NTN agrees that bearing components were properly within the scope of Commerce's investigations, but contends that the scope of the investigations is irrelevant. Rather, NTN asserts that it is unlawful for Commerce to calculate dumping margins on imported bearing components that are not sold as bearing components to an unrelated purchaser in the United States before they are incorporated into a finished antifriction bearing because the imported components have not been sold as required by 19 U.S.C. § 1673.
 
 II
 
 8
 Commerce may impose antidumping duties on merchandise imported into the United States if, pursuant to a bifurcated decision-making process,
 
 
 9
 the administering authority [Commerce] determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value
 
 
 10
 and the ITC finds injury to a domestic industry by reason of that imported merchandise. 19 U.S.C. § 1673. Following the statutory standard of review set forth in 19 U.S.C. § 1516a(b)(1)(B) (1988), the Court of International Trade held that Commerce's inclusion of NTN's components within the antidumping orders imposed on completed bearings was supported by substantial evidence on the record and was otherwise in accordance with law. To determine whether the Court of International Trade erred in applying that standard, we apply the statutory standard anew. PPG Indus., Inc. v. United States, 978 F.2d 1232, 1236 (Fed.Cir.1992) (citing Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 (Fed.Cir.1984)). Thus, we will affirm "the Court of International Trade unless we conclude that [Commerce's] determination is not supported by substantial evidence or is otherwise not in accordance with law." Id.
 
 
 11
 Resolving whether Commerce may properly include NTN's bearing components within the scope of its bearings antidumping orders is controlled by Samsung Electronics, a decision of this court affirming the Court of International Trade's judgment and adopting its opinion entitled Gold Star Co. v. United States, 692 F.Supp. 1382 (Ct. Int'l Trade 1988). In Gold Star, Commerce imposed an antidumping order on color television receivers from Korea. Samsung then requested a determination from Commerce regarding the applicability of the order to imports of certain television components and subassemblies, specifically printed circuit boards and color picture tubes that were employed in final product assembly in the United States after importation. Commerce issued a scope clarification in which it determined that the items did indeed fall within the scope of the order. Id. at 1383. The Court of International Trade affirmed Commerce's decision to include the separately imported color picture tubes and circuit boards within the scope of the antidumping order. The court reasoned:
 
 
 12
 The object of the dumping laws is to protect domestic producers against imported merchandise which "is being, or is likely to be, sold in the United States at less than its fair value...." 19 U.S.C. § 1673(1) (1982) (emphasis added). The present merchandise is sold on the U.S. market not as a [printed circuit board] nor as a [color picture tube], but as a color television receiver; the object of the original antidumping duty order. If the Court were to allow separate importations of [printed circuit boards] and [color picture tubes] (subsequently assembled together) to escape the purview of the [Color Television] Order, the domestic industry would continue to suffer the injurious consequences of dumped goods.
 
 
 13
 Id. at 1385 (footnote omitted).
 
 
 14
 Gold Star thus answered "yes" to the question of whether an antidumping order may, as a matter of statutory authority, reach imported components which are not sold in the United States as components but instead are sold as part of a product assembled in the United States, in circumstances where the imported components have no purpose other than to be assembled into an end product that would have been within the scope of the order had it been imported in an assembled form. By adopting the Gold Star opinion in Samsung, this court, as a matter of precedent, bound us to the same answer in this appeal.
 
 III
 
 15
 The facts presented by NTN in this case are strikingly similar to those in Gold Star/ Samsung. NTN concedes that the imported bearing components are dedicated solely for use in manufacturing completed bearings. Consequently, NTN's bearing components are sold in the United States when the finished bearings, which incorporate the components, are sold. Thus, including these components within the scope of an antidumping order does not constitute an evasion by Commerce of the sold or likely to be sold requirement of section 1673(1).
 
 
 16
 Moreover, we find further support for Commerce's practice in this case by the fact that Commerce may include components within the scope of the investigation. See Mitsubishi Elec. Corp. v. United States, 898 F.2d 1577, 1582 (Fed.Cir.1990). It would make little sense for Commerce to expend significant resources investigating certain imports, and for the ITC to determine that those imports were causing injury to a domestic industry, if Commerce were precluded from including those imports within the scope of the antidumping order arising out of the antidumping investigation.
 
 IV
 
 17
 The only issue that could have been dispositive in this appeal is whether Commerce properly made its less-than-fair value determination for bearing components. The issue arises because in these investigations, Commerce did not calculate margins for the components themselves. It simply assigned components the margins calculated for imports of assembled bearings. Although Commerce included parts within each of the five classes or kinds of bearings under investigation, it did not obtain the pricing information on the component parts because it was too onerous to construct a price at importation by backing out the value added to the components during the U.S. production process. Antifriction Bearings, 54 Fed.Reg. at 19,028. We recognize that, within each class or kind of merchandise, Commerce has discretion to use averages or generally recognized sampling techniques whenever a significant volume of sales is involved in determining U.S. price or foreign market value. 19 U.S.C. § 1677f-1(a) (1988). The statute gives Commerce exclusive authority to select appropriate samples and averages, but it also requires that such samples be "representative of the transactions under investigation." 19 U.S.C. § 1677f-1(b) (1988). In determining whether Commerce has abused its discretion in its sampling methodology we must take into account the circumstances of each case.
 
 
 18
 At oral argument, NTN's counsel agreed that NTN was not mounting a valid legal challenge to Commerce's sales sampling decision. Nor could NTN mount such a challenge at this time. In a prior appeal, NTN supported Commerce's determination to divide the scope of the bearings investigations into five classes or kinds of merchandise, each containing a type of bearing primarily distinguishable by rolling element, as well as parts thereof. See Torrington Co. v. United States, 938 F.2d 1276, 1277 (Fed.Cir.1991); Brief for Amici Curiae at 10-20, Torrington (No. 91-1020). By so doing, and by failing to argue that parts (i.e., components) constituted a separate class or kind of merchandise, which would have required price comparisons on components, NTN may only argue that Commerce abused its discretion in its choice of sampling methodology which excluded pricing for components. As Commerce explained in its final determination notice, it hoped that price-to-price comparisons based on bearing components as sold in the United States in their assembled condition would provide a reliable estimate of dumping margins for the imported components. In this manner Commerce reasoned it could reduce the reporting burden on respondents such as NTN and be able to complete the investigations within the statutory deadline. Antifriction Bearings, 54 Fed.Reg. at 19,028-29. When Commerce determined these data unreliable, it excluded them from the final calculations and assigned margins to components based on the margins for assembled bearings. See id. In these investigations, where the volume of bearings sales was enormous, we cannot say that Commerce abused its discretion in deciding to assign a margin rate to bearing components, particularly when NTN itself suggested that "ITA calculate margins only on completed bearings imported from Japan and apply the same rate, if any, to parts."
 
 V
 
 19
 As alternative relief, NTN requests that this case be remanded to Commerce so that Commerce may determine whether the amount of value added to the bearing components it imports is sufficiently substantial to render the imported merchandise outside the scope of the investigations. See, e.g., Roller Chain, Other Than Bicycle, from Japan, 48 Fed.Reg. 51,801, 51,804 (Dep't Comm. Nov. 14, 1983) (final admin. review). NTN admits that it did not supply the information necessary for Commerce to make such a fact-specific decision, but alleges that it would have been a futile act to do so because Commerce did not request value-added information and would not have verified such information had NTN submitted it. See 19 C.F.R. § 353.31(b)(2) (1992) ("The Secretary normally will not consider or retain in the record of the proceeding unsolicited questionnaire responses...."). In an antidumping investigation, however, the burden falls on the importer to demonstrate that its imported products should be excluded from the scope of an antidumping investigation. See 19 C.F.R. §§ 353.31, 353.37 (1992). Even though Commerce specifically did not ask for the value-added information that would have enabled it to make such an exclusion determination for NTN's components, it was NTN's burden to supply the information in the first instance along with its request for a substantial value-added exclusion. Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed.Cir.1993) ("The burden of production [belongs] to the party in possession of the necessary information."); see Tianjin Mach. Import & Export Corp. v. United States, 806 F.Supp. 1008, 1015 (Ct. Int'l Trade 1992) ("[T]he burden of creating an adequate record lies with respondents and not with Commerce."); 19 U.S.C. § 1677e(c) (1988). After failing to meet this burden, NTN cannot now insist that Commerce determine whether its imported components fall within the insignificant value exclusion. In addition, NTN may still request a prospective scope ruling on this issue from Commerce. See 19 C.F.R. § 353.29(e)(1) (1992).
 
 
 20
 For these reasons the judgment of the Court of International Trade is
 
 
 21
 AFFIRMED.