**Slip Op. 99-144**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, JUDGE**

| | |
|---|---|
| LG SEMICON CO., LTD., and LG SEMICON AMERICA, INC., | |
| Plaintiffs, | |
| v. | **PUBLIC VERSION** |
| UNITED STATES, | Court No. 98-10-03076 |
| Defendant, | |
| and | |
| MICRON TECHNOLOGY, INC., | |
| Defendant-Intervenor. | |

Dated: December 30, 1999

Kaye, Scholer, Fierman, Hays,& Handler, LLP (Michael P. House and Raymond Paretzky) for plaintiffs LG Semicon Co., Ltd. and LG Semicon America, Inc.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Kenneth S. Kessler, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; Office of the Chief Counsel for Import Administration, United States Department of Commerce (Patrick V. Gallagher, Jr.), of counsel, for defendant.

Hale and Dorr, LLP (Gilbert B. Kaplan, Michael D. Esch, Paul W. Jameson, and Cris R. Revaz) for defendant-intervenor Micron Technology, Inc.

**OPINION**

**GOLDBERG, Judge:** In this action, the Court reviews the United States Department of Commerce's ("Commerce") Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea: Final Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative Review and Notice of Determination Not to Revoke Order, 63 Fed. Reg. 50,867 (Sept. 23, 1998), as amended, 63 Fed. Reg. 56,906 (Oct. 23, 1998)("Final Results"). Plaintiffs LG Semicon Co., Ltd. and LG Semicon America, Inc. (collectively "LG Semicon") complain that in the Final Results Commerce applied a "knew or should have known" standard to determine that third country sales should be treated as U.S. sales for purposes of calculating a dumping margin. According to plaintiffs, the proper test should be actual knowledge. Plaintiffs also argue that regardless of the standard applied, Commerce's determination is not supported by substantial evidence.

The Court exercises jurisdiction to review this motion for judgment upon the agency record pursuant to 28 U.S.C. § 1581(c)(1994). The Court sustains Commerce's Final Results.

## I.
## BACKGROUND

On April 22, 1992, Micron Technology, Inc. ("Micron"), the defendant-intervenor in the instant action, filed an antidumping petition alleging that Dynamic Random Access Memory Semiconductors ("DRAMs") imported from Korea were being sold in the United States at less than fair market value. After an investigation, Commerce published, on May 10, 1993, an antidumping duty order covering such imports. Antidumping Duty Order and Amended Final Determination: Dynamic Random Access Memory Semiconductors of One Megabit and Above from the Republic of Korea, 58 Fed. Reg. 27,520 (May 10, 1993).

In response to requests from both domestic and foreign producers, Commerce initiated the fourth antidumping duty administrative review of the order on July 19, 1997. Initiation of Antidumping and Countervailing Duty Administration Reviews and Request for Revocation in Part, 62 Fed. Reg. 33,394 (July 19, 1997). The review covered the period May 1, 1996, through April 30, 1997. Id. On March 3, 1998, Commerce published its preliminary results of the fourth review. Dynamic Random Access Memory Semiconductors of one Megabit or Above From the Republic of Korea; Preliminary Results of Antidumping Duty Administrative

Review and Notice of Intent not to Revoke Order, 63 Fed. Reg.

11,411 (Mar. 9, 1998)("Preliminary Results").

In the Preliminary Results, Commerce "determined that a

number of sales LG [Semicon] had reported as being to a third

country were actually sales to the United States." Id. at

11,412. As a result, Commerce used "both the reported and the

unreported sales to the United States" to calculate LG Semicon's

dumping margin. Id. LG Semicon challenged the Preliminary

Results. It claimed it had no knowledge that its third country

sales, which consisted of DRAMs sold to a foreign business, would

be exported to the United States. See App. to Pls. LG Semicon

Co., Ltd. and LG Semicon America, Inc.'s Reply Br. in Supp. of

Pls.' Mot. for J. upon the Agency R. ("Pls.' App."), at

Confidential Record ("C.R.") 1935 (Case Br. of LG Semicon Co.,

Ltd. and LG Semicon America, Inc. (Apr. 28, 1998), 26-27).

Nonetheless, Commerce maintained in the Final Results that

"a number of sales that LG reported as third-country sales were

actually [unreported] sales to the United States." 63 Fed. Reg.

at 50,868. It determined "that at the time LG made these sales

it knew, or should have known, that the DRAMs were destined for

consumption in the United States." Id. Thus, in calculating LG

Semicon's dumping margin of 9.28%, Commerce included LG Semicon's

sales to the foreign business.  See id.

## II.
### STANDARD OF REVIEW

Commerce's Final Results will be sustained if they are supported by substantial evidence on the record and are otherwise in accordance with the law.  See 19 U.S.C. § 1516a(b)(1)(B) (1994).

To determine whether Commerce's interpretation of a statute is in accordance with law, the Court applies the two-prong test set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron first directs the Court to determine "whether Congress has directly spoken to the precise question at issue."  Id. at 842.  The Court first looks to the statute's text to ascertain "Congress's purpose and intent."  Timex V.I., Inc. v. United States, ___ Fed. Cir. (T) __, __, 157 F.3d 879, 881 (1998) (citing Chevron, 467 U.S. at 842-43 & n.9).  If the plain language of the statute is not dispositive, the Court will then consider the statute's structure, canons of statutory interpretation, and legislative history.  See id. at 882 (citing Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 470-80  (1997)); Chevron 467 U.S. at 859-63; Oshkosh Truck Corp. v. United States, 123 F.3d 1477,

1481 (Fed. Cir. 1997)).  If Congress's intent is unambiguous, the Court must give it effect.  See id.

If the statute is either silent or ambiguous on the question at issue, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843 (footnote omitted).  Thus, the second prong of the Chevron test directs the Court to consider the reasonableness of Commerce's interpretation.  See id.

With respect to Commerce's factual findings, the Court will uphold the agency if its findings are supported by substantial evidence.  "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion."  Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (citations omitted), aff'd, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).  In applying this standard, courts must sustain Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions.  See Atlantic Sugar, Ltd. v. United States, 2 Fed. Cir. (T) 130, 137, 744 F.2d 1556, 1563 (1984).

### III.
### DISCUSSION

In the discussion below, the Court first examines whether Commerce's application of the "knew or should have known" standard is in accordance with the law.  The Court then considers whether Commerce's finding that LG Semicon "knew or should have known" the DRAMs sold to the foreign business were destined for the United States is supported by substantial evidence.  The Court finds in the affirmative on both questions.

**A.    Commerce's Application of the "Knew or Should Have Known" Standard is Consistent with Legislative Intent and Prior Practice.**

LG Semicon asserts that Commerce incorrectly classified the DRAMs sold to the foreign business as "unreported U.S. sales" and thus incorrectly included such sales in LG Semicon's dumping margin.  See Br. of Pls. LG Semicon Co., Ltd. and LG Semicon America, Inc. in Supp. of Pls.' Mot. for J. Upon the Agency R. ("Pls.' Br."), at 2.  Specifically, LG Semicon challenges Commerce's finding that LG Semicon "knew or should have known" the ultimate destination of the DRAMs. See id.  LG Semicon claims that the U.S. antidumping statute, legislative history, holdings of this court, and Commerce's own administrative decisions do not

support Commerce's application of the "knew or should have known"

standard.  Id.  The Court does not agree.

Under the U.S. antidumping statute, dumping margins are

determined by comparing export price to normal value. See 19

U.S.C. §§ 1675(a)(2), 1677a(a), 1677f-1(c)(1994).

> The term "export price" means the price at
> which the subject merchandise is first sold
> (or agreed to be sold) before the date of
> exportation [to the U.S.] by the producer or
> exporter of the subject merchandise outside of
> the United States to an unaffiliated purchaser
> in the United States or to an unaffiliated
> purchaser for exportation to the United
> States.

19 U.S.C. § 1677a(a)(emphasis added).  Thus, according to the

plain language of the statute, Commerce must base export price

not only on sales of the subject merchandise to unaffiliated

purchasers in the United States, but also on sales to

unaffiliated purchasers outside of the United States "for

exportation to the United States."  Id.  Congress did not,

however, instruct Commerce how to determine if merchandise has

been sold "for exportation to the United States" in the text of

the statute itself.

LG Semicon contends that Congress's intent on this matter is

evident from legislative history and that Commerce's application

of the "knew or should have known" standard is contrary to such

intent.  See Pls.' Br., at 16.  Commerce and Micron argue that Commerce's standard comports with legislative intent.  See Def.'s Mem. in Opp'n to Pls.' Mot. for J. Upon the Agency R. ("Def.'s Br."), at 18-19; Br. of Def.-Intervenor Micron Technology, Inc. in Opp'n to Pls.' Mot. for J. on the Agency R., ("Def.-Intervenor's Br."), at 10-11.  The Court agrees.

Commerce's "knew or should have known standard" is plainly consistent with Congressional intent. The definition of "purchase price"[1] in the Statement of Administrative Action ("SAA") accompanying the Trade Agreements Act of 1979, "makes clear that if the producer <u>knew or had reason to know</u> the goods were for sale to an unrelated U.S. buyer...the producer's sales price will be used as 'purchase price' to be compared with that producer's foreign market value."  H.R. Doc. No. 96-153, at 411 (1979)(emphasis added).  And the SSA was expressly approved by Congress.  See 19 U.S.C. § 2503(a) (1994) ("Congress approves the

---

[1] The terminology originally used was "purchase price." Congress later changed the term to "export price."  See 19 U.S.C. § 1677a(a).  Congress made clear, however, that the two terms are coextensive.  See The Uruguay Round Agreement Act, Statement of Administrative Action,  H.R. Doc. 103-316, at 822-23 (1994) ("Notwithstanding the change in terminology, no change is intended in the circumstances under which export price (formerly 'purchase price') versus construed export price (formerly 'exporters sales price') are used.").

trade agreements...submitted to the Congress on June 19, 1979, and the statements of administrative action proposed to implement such trade agreements submitted to the Congress on that date.").

LG Semicon also argues that Commerce's "knew or should have known" standard is impermissible because it is contrary to Commerce's prior consistent practice. See, e.g., M.M. & P. Maritime Advancement, Training, Educ. & Safety Program v. Department of Commerce, 2 Fed. Cir. (T) 36, 43-44, 729 F.2d 748, 755 (1984) (Commerce is obligated to follow a consistent practice unless it supplies adequate explanation).  LG Semicon maintains that Commerce's consistent practice has been to apply an actual knowledge standard when evaluating whether third-party sales were "for" exportation to the United States. Pls.' Br., at 16-25.  The Court disagrees with this contention.

In its briefs, LG Semicon identifies several determinations and cases that contain poorly crafted passages and language choices which tend to cloud the standard utilized by Commerce. See, e.g., INA Walzlager Schaeffler KG v. United States, 21 CIT __, 957 F. Supp. 251 (1997); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results of Antidumping Duty Administrative Reviews, 61 Fed. Reg. 65,527, 65,539 (Dec. 13, 1996).  An examination of

these determinations and cases, however, together with other

Commerce determinations and judicial opinions, demonstrates that

Commerce's application of the "knew or should have known"

standard is consistent with the prior practice of the agency.[2]

First, Commerce has consistently applied the "knew or should

have known" standard in prior determinations.  For example, in

Certain Pasta from Italy: Termination of New Shipper Antidumping

Administrative Review, 62 Fed. Reg. 66,602 (Dec. 19, 1997),

---

[2] For example, LG Semicon cites NSK Ltd. v. United States,
21 CIT__, 969 F. Supp. 34 (1997), for the proposition that
Commerce utilizes a "knowledge" test which evaluates only actual
knowledge. LG Semicon bases this contention, in part, on the
legislative history cited by NSK which states that "if a producer
knew that the merchandise was intended for sale to an unrelated
purchaser in the United States..., the producer's sale prices to
an unrelated middleman will be used as the purchase price."  969
F.Supp., at 60 (citing S.Rep. No. 96-249, at 94 (1979), reprinted
in U.S.C.C.A.N. 381, 480 (emphasis added).
    But the NSK court also cited, in the same string citation no
less, H.R. No. 96-153, at 411, which states that, "[t]he
definition makes clear that if the producer knew or had reason to
know the goods were for sale to an unrelated U.S. buyer,...the
producer's sales price will be used as 'purchase price'."
(emphasis added).
    Likewise, LG Semicon is misled by the INA decision. See 957
F. Supp. at 263.  Unfortunately, INA is susceptible to
misinterpretation due to its somewhat nebulous distinction
between Section 1677a(b) and Section 1677b(a).  See id.  LG
Semicon contends that INA makes a distinction based on the
statutory provisions' different requirements for actual and
imputed knowledge.  See Pls.' Br., at 20-21.  The distinction INA
actually makes between the two statutory provisions, however, is
one between general and specific knowledge.  See INA, 957 F.
Supp., at 263-65 & n.3.

Commerce concluded that the sales of a pasta product in the
United States should have been assigned to the pasta's Italian
producer, not the unaffiliated U.S. trading company.  See id. at
66,602-03. Commerce stated that "certain proprietary information
on the record concerning the nature of the relationship between
the parties involved in this review demonstrate that the producer
knew or had reason to know that the pasta it sold...was destined
for the United States." Id. (emphasis added); accord Television
Receivers, Monochrome and Color, From Japan; Final Results of
Antidumping Duty Administrative Review, 58 Fed. Reg. 11,211,
11,216 (Feb. 24, 1993); Natural Bristle Paint Brushes and Brush
Heads From the People's Republic of China; Final Results of
Antidumping Duty Administrative Review, 55 Fed. Reg. 42,599,
42,599-61 (Oct. 22, 1990).

Moreover, Commerce's use of the "knew or should have known"
standard was recognized and upheld by this court and the Federal
Circuit in Yue Pak, Ltd. v. United States, 20 CIT 495 (1996),
aff'd, No. 96-1398, 1997 WL 130319 (Fed. Cir. Mar. 21,
1997)(unpublished).  In reviewing Commerce's practice this court
found that

> Commerce interprets the phrase "for
> exportation to the United States" to mean that
> the reseller or manufacturer from whom the

merchandise was purchased <u>knew or should have known</u> at the time of the sale that the merchandise was being exported to the United States.

<u>Yue Pak</u>, 20 CIT at 498 (emphasis added)[3].  Further, the court sustained Commerce's determination because the evidence was "adequate to support Commerce's conclusion that Plaintiff's suppliers <u>knew or should have known</u> of the U.S. destination of the merchandise."  See <u>id.</u> at 503 (emphasis added).

In conclusion, Commerce's application of the "knew or should have known" standard is in conformance with legislative history, is a consistent practice of the agency, and has been previously sustained by this court.  Thus, the Court finds Commerce's <u>Final Results</u> to be in accordance with the law.

---

[3] The Court acknowledges that the <u>Yue Pak</u> Court cites two cases that do not seem to explicitly support this proposition. See <u>Yue Pak</u>, 20 CIT 498 (citing <u>Sandvik AB v. U.S.</u>, 13 CIT 738, 721 F. Supp. 1322, <u>aff'd</u>, 904 F.2d 46 (Fed. Cir. 1990); <u>Peer Bearing Co. v. U.S.</u>, 16 CIT 799, 803-804, 800 F. Supp. 959, 964 (1992)); Pls.' Br., at 24. Nonetheless, the Court defers to the <u>Yue Pak</u> court's decision, and the Federal Circuit's affirmation thereof, and finds that the cases cited at least tangentially support the proposition.  See <u>id.</u>  This deference is especially appropriate in light of numerous other Commerce determinations that consistently apply the "knew or should have known" standard.

**B.    Commerce's Determination that LG Semicon Knew or Should Have Known That DRAMs it Sold to the Foreign Business Were Destined for Export to the United States is Supported by Substantial Evidence.**

LG Semicon next argues that Commerce's determination is not supported by substantial evidence under either the "actual knowledge" standard urged by LG Semicon or the "knew or should have known" standard used by Commerce.  See Pls.' Br., at 25-43.

The administrative record as a whole, however, supports Commerce's finding that LG Semicon knew or should have known the DRAMs sold to the foreign business were destined for export to the United States.  Commerce determined that LG Semicon knew or should have known its DRAMs were destined for export to the United States for a number of reasons.  See Def.'s Br., at 24-37. The Court will address the most compelling reasons here.  First, the volume of DRAMs LG Semicon sold to the foreign business was disproportionate to the foreign business' production capacity and the corresponding market capacity.  Second, the foreign business bears the indices of a maquiladora, a common mechanism for exportation of goods from Mexico to the United States.  And finally, LG Semicon monitored the U.S. DRAMs market closely and would have been aware of sales of its product in the United States by an external source.

The strongest evidence on the record is the volume of sales LG Semicon made to the foreign business during the period of review ("POR") in comparison to the size of the foreign business' operations and the relevant non-U.S. market. See 63 Fed. Reg. at 50,876-77; Pls.' App., at CR 2023 (Mem. of 09/08/98 from John Conniff to Holly Kuga ("Unreported Sales Mem.")). This evidence supports Commerce's conclusion that given the number of DRAMs it sold to the foreign business, LG Semicon knew or should have known that the foreign business could not process those DRAMs; and that neither the Mexican nor Latin American market could absorb the DRAMs.

The sales statistics as evidence is persuasive. LG Semicon sold a large number of DRAMs to the foreign business during the POR. See App. to Def.-Intervenor Micron Technology, Inc.'s Br. in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.-Intervenor's App."), at CR 1902 (Letter of 04/22/99 from Michael Kaplan, et al. to LaRussa, ("LaRussa Letter"), 15). Put in perspective, LG Semicon's sales of DRAMs to the foreign business during the POR were nearly three times LG Semicon's aggregate sales in the United States -- the largest market for DRAMs in the world -- during the same period. See id. Significantly, in a

short span of time, the foreign business became the world's largest customer of LG Semicon's American operation.  See Id. And, LG Semicon was allegedly only one of the many companies that supplied DRAMs to the foreign business. See Pls.' App., at CR 1860 (Mem. of 01/14/98 from Brian C. Smith and Rebecca Woodings to Louis Apple, 6.).

The sales statistics are particularly significant because of the size and limited production capabilities of the foreign business.  By LG Semicon's own account, the foreign business utilized few production lines with few production workers.  See Def.-Intervenor's App., at CR 1853 (Letter of 03/24/98 from Kaye, Scholer, Fierman, Hayes & Handler LLP to the Secretary of Commerce ("Kaye, Scholer Letter of 03/24/98"), App. 1, Decl. of Robert Simon, LG Sales Dir. for the Southwestern Area ("Simon Decl."), ¶ 4).

Moreover, the relevant foreign markets that might have been able to absorb the DRAMs LG Semicon sold to the foreign business were limited.  See Unreported Sales Mem., 6.  The Mexican market for integrated circuits, of which only a portion is attributed to DRAMs, is approximately $200 million a year. See id.  The entire Latin American market for integrated circuits is $400 million.

See id.  Because LG Semicon's sales to the foreign business were substantial, those sales alone accounted for a large part of both the Mexican and Latin American markets for integrated circuits.

In short, LG Semicon sold a disporportionate number of DRAMs to a limited assembly facility within a limited market.  This evidence reasonably supports Commerce's conclusion that LG Semicon knew or should have known that the DRAMs it sold to the foreign business most likely could not be processed by that entity or absorbed by the Mexican or Latin American markets, and instead were destined for export to the United States.  This conclusion is especially sound when LG Semicon's self-proclaimed "intimate knowledge" of the foreign business and DRAM market is taken into account.  See Simon Decl., ¶ 4; Kaye, Scholer Letter of 03/24/98, at App. 2, Decl. of Daniel Lee, Gen. Manager of Sales for LG Semicon America, Inc. ("Lee Declaration"), ¶ 3-7; Def.'s App. for Def.'s Mem. in Opp'n to Pls.' Mot. for J. upon the Agency R. ("Def.'s App."), at Ex. 2 (Mem. of 07/17/98 from Tom Futtner & John Conniff to Holly Kuga("Commerce Mem. of 07/17/98"), 3).

As additional support for its determination, Commerce asserts that the foreign business is a maquiladora.  See Def.'s

Br., at 29-30. A maquiladora is defined in the administrative

record as "a Mexican corporation operating under a special

customs regime which allows the corporation to temporarily import

into Mexico duty-free, raw material, equipment, machinery,

replacement parts, and other items needed for the assembly or

manufacture of finished goods for subsequent export." See

LaRussa Letter, Attach. 3, NAFTA FAQs About Maquiladoras.  In

Commerce's view, the foreign business' status as a maquiladora

should have alerted LG Semicon to the likelihood that its DRAMs

would be exported to the United States.  See Def's. Br., at 29-

30.  As evidence that the foreign business is a maquiladora,

Commerce cites the facility's proximity to the U.S. border,[4] its

assembly of electronics (an industry that dominates maquiladora

trade),[5] and the numerous importation documents which identify the

---

[4] The record contains information demonstrating that in 1996, 80% of goods exported by maquiladoras were exported to the United States. See LaRussa Letter, Attach. 5, Camila Castellanos, Maquiladora Industry Spurs Development, Novedas Editores, S.A. de C.V.

[5] See LaRussa Letter, Attach. 5, Maquiladoras-Recent Trends and Growth ("The largest concentration of maquiladoras is in electronics, textiles, and autoparts and accessories.").

foreign business as a maquiladora.[6]

Notably, LG Semicon does not deny that the foreign business is a maquiladora, but instead claims that even if the facility is a maquiladora, this does not establish that the DRAMs sold to the foreign business were destined to be exported to the United States. See Pls.' Br., at 36-37. It is true that the foreign business' probable status as a maquiladora is not dispositive to this inquiry. It does, however, lend further support to Commerce's finding that LG Semicon knew or should have known the DRAMs it sold to the foreign business would be exported to the United States. Specifically, Commerce could reasonably infer from the foreign business' probable maquiladora status, together with the other evidence, that LG Semicon knew or should have known the foreign business could not use all the DRAMs it bought from LG Semicon to manufacture a domestically marketable product. Commerce could also infer that LG Semicon knew or should have known that the surplus DRAMs would likely be exported to the

---

[6] See Kaye, Scholer Letter of 03/24/98, Attach. 5, decl. of Chris Chun, Ex. A. Exhibit A contains seventy-six customs documents listing the exporter as LG Semicon and the importer as the foreign business. See id. Each document classifies the foreign business as operating as a maquiladora. See id.

United States through the foreign business' existing maquiladora mechanism.

Lastly, there is substantial evidence supporting Commerce's assertion that LG Semicon knew or should have known of the importation of the DRAMs it sold to the foreign business because LG Semicon would have been alerted to the presence of substantial numbers of new LG Semicon DRAMs in the U.S. market. See Def's. Br., at 36; Def.-Intervenor.'s Br., at 43-44. LG Semicon's direct sales to the U.S. market during the POR were minimal. See LaRussa Letter, 15. The administrative record demonstrates that a substantial number of LG Semicon's DRAMs were exported by the foreign business to the United States. See Unreported Sales Mem., 2. Importantly, the value of documented exports, alone, was approximately equal to the value of DRAMs sold by LG Semicon in the United States during the POR. See LaRussa Letter, 15. Moreover, there is no evidence that the LG Semicon DRAMs exported by the foreign business were entered into the United States as components of other products. Given these facts, as well as the sworn affidavits from Micron and LG Semicon employees attesting to substantial knowledge of the daily fluctuations of the U.S.

DRAMs market,[7] it is unlikely that LG Semicon was not aware that a substantial number of new LG Semicon DRAMs were placed on the U.S. market.  Together with other supporting evidence, this reasonably supports Commerce's conclusion that LG Semicon knew or should have known that its continuing sales to the foreign business were being exported to the United States.

In summary, the Court finds substantial evidence to sustain Commerce's <u>Final Results</u>.  Together, the volume of DRAMs LG Semicon sold to the foreign business compared to the foreign business' production capacity and corresponding market capacity, the foreign business' probable status as a maquiladora, and LG Semicon's awareness of the U.S. DRAMs market, support Commerce's determination.

---

[7] <u>See</u> Simon Decl.; LaRussa Letter,  Ex. 4, aff. of Joseph D'Esopo, ¶ 2.

## IV.
## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court sustains
Commerce's <u>Final Results</u>.  A separate order will be entered
accordingly.


 

 

 

_____
Richard W. Goldberg
                  JUDGE
Date: December 30, 1999
      New York, New York